UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MICHEAL M. BADTKE,

        Plaintiff,

        v.                          Case No. 19-C-1723

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

        Defendant.

## DECISION AND ORDER AFFIRMING THE COMMISSIONER'S DECISION

Plaintiff Micheal Badtke filed a complaint seeking review of the decision of the Commissioner of Social Security. She contends that the decision of the administrative law judge (ALJ) is flawed and requires remand. For the following reasons, the Commissioner's decision will be affirmed.

## BACKGROUND

Badtke received supplemental security income benefits based on disability as a child. R. 41. Once she attained age 18, Badtke's eligibility for disability benefits was redetermined under the rules for determining disability in adults. In her application for benefits as an adult, she listed Asperger syndrome, anxiety, and depression as the conditions limiting her ability to work. R. 416. On March 21, 2014, it was determined that Badtke was no longer disabled as of March 21, 2014. The determination was upheld on reconsideration. Badtke also erroneously received approval for child disability benefits upon attainment of age 18, but the field office realized its error at the reconsideration level and pursued an initial medical determination on her claim for child disability benefits. Badtke filed a written request for a hearing on her supplemental security income claim

and her child disability benefits claim. On July 28, 2017, ALJ Margaret O'Grady held a hearing at which Badtke, who was represented by counsel, and a vocational expert (VE) testified. R. 67–97.

At the time of the hearing, Badtke was 22 years old and lived with her aunt in Sheboygan, Wisconsin. R. 70. Her mother had passed away the previous December of a ruptured brain aneurism. R. 72, 86. Badtke had completed high school but had never held a job or worked for pay in any way. R. 71. She testified that her aunt paid for all of her expenses and necessities. R. 72. She reported taking several medications, including Fluoxetine and Lorazepam for anxiety. *Id.* Badtke testified that, since moving in with her aunt, her typical schedule was to wake up at about 5:00 p.m., play or talk to people on the computer throughout the night, eat meals at midnight and 4:00 a.m., and then go to sleep at 5:00 a.m. R. 72–73. She stated that she usually ate leftovers of meals cooked by her aunt. R.73. Badtke testified that she did not do simple chores because she did not want to. R. 74.

Badtke testified that she tended to avoid social interaction because it causes her stress. *Id.* She indicated that she visited with her mother's friend, whom she considered an adopted mom, about twice a month and visited with a friend when she came home from college, but most of her socialization occurred online with people from around the world who shared her interest in role play. R. 74–75, 80. She testified that she could spend eight or nine hours a night going back and forth online with others and writing stories. R. 87. Badtke stated that she occasionally goes to the grocery store and to hair appointments. R. 75.

Badtke explained that she felt that she was unable work because she does not follow directions well and gets indignant when people try to get her to do things she does not want to do. R. 76. She indicated that she was diagnosed with depression after her mother passed away. R. 82. She testified that she generally did not get along with teachers, despite the fact that her aunt is a

2

teacher. R. 79–80. Although more than once she has obtained learner's permits, she stated that she had not followed through with getting a driver's license because driving makes her anxious and she distrusts other people. R. 82. As to her physical limitations, she stated that a chiropractor diagnosed her with arthritis in her neck and that she had a chronic back injury that flared up about every three or four months. R. 77. She confirmed, though, that her last flare up occurred about a year prior and that she had not seen a doctor for her back since October. R. 77–78.

In a sixteen-page decision dated September 13, 2017, the ALJ concluded that Badtke did not meet the criteria for disability at any time since the attainment of age 18 through the date of the decision, Badtke's disability ended on March 21, 2014, and she had not become disabled again since that date. R. 41–56. In reaching her decision, the ALJ followed the five-step sequential evaluation established by the Social Security Administration (SSA) for determining disability. R. 42. The relevant period for the purposes of Badtke's child disability benefits claim was from April 26, 2013, through the date of the decision, and the relevant period for purposes of her supplemental security income claim was from March 21, 2014, the disability cessation date, through the date of the decision.

The ALJ noted that Badtke attained age 18 on April 26, 2013, and was eligible for supplemental security income benefits as a child for the month preceding the month in which she attained age 18. Badtke was notified that she was found no longer disabled as of March 21, 2014, based on a redetermination of disability under the rules for adults who file new applications. R. 44. The ALJ observed that Badtke had not engaged in substantial gainful activity through the date of the decision. *Id.* The ALJ found that Badtke had the following severe impairments: depression, an anxiety disorder, pervasive development disorder, and Asperger's syndrome. *Id.* The ALJ determined that Badtke did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix

3

1. R. 45. She then assessed Badtke's residual functional capacity (RFC), finding that she could perform medium work "except she can perform simple, routine, repetitive and non-complex work. The claimant can have no public interaction and she can have only occasional interaction with coworkers and supervisors. She can handle minimal to no change in her work routine. The claimant cannot perform fast-paced production level work, teamwork or tandem work." R. 48.

The ALJ found that Badtke had no past relevant work, but considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Badtke could perform, including hand packager, linen clerk, and floor waxer. R. 54–55. The ALJ specified that, with regard to Badtke's supplemental security income claim, her disability ended on March 21, 2014, and she had not become disabled again since that date. *Id.* With regard to her child disability benefit claim, the ALJ found that she was not disabled at any time through the date of the decision. *Id.* After consideration of additional information in support of her claim, the Appeals Council ultimately denied Badtke's request for review of the ALJ's decision, making that decision the final decision of the Commissioner in her case. R. 1.

## LEGAL STANDARD

The burden of proof in social security disability cases is on the claimant. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled."). While a limited burden of demonstrating that other jobs exist in significant numbers in the national economy that the claimant can perform shifts to the SSA at the fifth step in the sequential process, the overall burden remains with the claimant. 20 C.F.R. § 404.1512(f). This only makes sense, given the fact that the vast majority of people under retirement age are capable of performing the essential functions required for some subset of the myriad of jobs that exist in the national economy. It also makes sense because, for many physical and mental impairments, objective evidence cannot distinguish those that render a person incapable of full-time work from those that

4

make such employment merely more difficult. Finally, placing the burden of proof on the claimant makes sense because many people may be inclined to seek the benefits that come with a finding of disability when better paying and somewhat attractive employment is not readily available.

The determination of whether a claimant has met this burden is entrusted to the Commissioner of Social Security. Judicial review of the decisions of the Commissioner, like judicial review of all administrative agencies, is intended to be deferential. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The Social Security Act specifies that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). But the "substantial evidence" test is not intended to reverse the burden of proof. In other words, a finding that the claimant is not disabled can also follow from a lack of convincing evidence.

Nor does the test require that the Commissioner cite conclusive evidence excluding any possibility that the claimant is unable to work. Such evidence, in the vast majority of cases that go to hearing, is seldom, if ever, available. Instead, the substantial evidence test is intended to ensure that the Commissioner's decision has a reasonable evidentiary basis. *Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015) ("The substantial-evidence standard, however, asks whether the administrative decision is rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the same record).").

The Supreme Court has reaffirmed that, "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The phrase 'substantial evidence,'" the Court explained, "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Id.* "And whatever the meaning of 'substantial' in

5

other contexts," the Court noted, "the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence is "'more than a mere scintilla.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229). It means—and means only—"'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*

The ALJ must provide a "logical bridge" between the evidence and his or her conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). "Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). But it is not the job of a reviewing court to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Given this standard, and because a reviewing court may not substitute its judgment for that of the ALJ, "challenges to the sufficiency of the evidence rarely succeed." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Additionally, the ALJ is expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

**A. Evaluation of the Opinion Evidence**

Badtke asserts that the ALJ erred in evaluating the medical opinion of consulting rehabilitation psychologist Steven Kaplan, Ph.D. Because Dr. Kaplan did not have a treating

6

relationship with Badtke, he is a "nontreating source." A nontreating source is "a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. The ALJ was permitted to evaluate the opinion's weight in light of the factors listed in 20 C.F.R. § 404.1527(c)(2)–(6), such as treatment relationship, supportability, consistence, specialization, and other factors. *See Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009).

In July 2017, consulting rehabilitation psychologist Steven Kaplan, Ph.D., conducted a mental status examination of Badtke. At that point, her mother had died fairly recently and Badtke was living with her aunt. R. 880. Dr. Kaplan noted that she was "marginally groomed and dressed" and "had noticeable body odor." R. 881. He found her "engaged and cooperative" but with an "anxious to constrained" affect and depressed mood. *Id.* "She did not adequately respond to non-verbal cues, and her eye contact was stilted and inconsistent." *Id.* He found no deficiencies in memory or attention but determined that "her concentration is spotty and unreliable, and it is not up to competitive vocational demands." *Id.* Badtke's aunt stated that Badtke sometimes took "two or more days to adjust to even minor changes in her routine" and that most of her time was "consumed by solitary activities." R. 881–82. Dr. Kaplan concluded that Badtke had "very little actual social contact," was plagued by fears, did "virtually nothing independent of her aunt," and was incapable of living independently. R. 882. He diagnosed her with autism spectrum disorder, major depressive disorder, specified anxiety disorder, and binge eating. *Id.* He opined that Badtke's autism spectrum disorder was "functionally severe" and precluded her ability to work full time. *Id.* He further indicated that she would be unable to work at a steady pace and that she had "profound limitations in her ability to socially interact, or to accept criticism or to maintain basic standards of neatness." R. 881. He opined that she was unable to "withstand significant work stressors, or stay on task and reliably carry out work instructions," "would be disruptive to

7

her peers in any given work environment," and would "miss work at least 3–4 days per month due to emotional and behavioral problems." R. 883.

The ALJ provided sufficient reasons for assigning little weight to Dr. Kaplan's opinion. R. 53. She found that Badtke and her aunt "significantly downplayed the claimant's activities at the time of the examination and they did not provide Dr. Kaplan with an accurate basis for his opinion." *Id.* Badtke asserts that the ALJ's conclusion that she and her aunt downplayed her activities is purely speculative. But the ALJ concluded that Dr. Kaplan's extreme limitations were inconsistent with the evidence in the record. She discussed Badtke's role-playing and attendance at anime conferences as well as "other social activities with friends" as undermining his conclusions. *Id.* Although Badtke argues that the ALJ erred by failing to address whether Dr. Kaplan's findings were consistent with his observations, the ALJ did discuss all of those observations, R. 50, and to the extent they were consistent with other evidence in the record, the ALJ explained how she accounted for them in the RFC. The ALJ determined that Dr. Kaplan's opinions were not consistent with the "conservative and minimal mental health treatment during the relevant period" or "the relatively mild clinical abnormalities noted by other examiners." R. 53. In sum, the ALJ noted that Dr. Kaplan's opinions were inconsistent with other substantial evidence in the record. The ALJ provided an "accurate and logical bridge" between the evidence and her conclusions. *Roddy*, 705 F.3d at 636.

## B. Credibility

Badtke also contends that the ALJ erred in evaluating her subjective symptoms. The Social Security regulations set forth a two-step procedure for evaluating a claimant's statements about the symptoms allegedly caused by her impairments. *See* 20 C.F.R. § 404.1529. First, the ALJ determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged." § 404.1529(a). If so, the ALJ then "evaluate[s] the

8

intensity and persistence" of a claimant's symptoms and determines how they limit the claimant's "capacity for work." § 404.1529(c). In doing so, the ALJ considers all the available evidence as well as the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of her pain or other symptoms; (3) the precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) other treatment; and (6) any other factors concerning functional limitations and restrictions due to pain or other symptoms. *See* § 404.1529(c)(3); *see also* SSR 16-3p. "ALJ credibility determinations are given deference because ALJs are in a special position to hear, see, and assess witnesses." *Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014) (citation omitted). On judicial review, the court must "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)). The court is not to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner." *Lopez*, 336 F.3d at 539. "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong . . . and deserving of reversal." *Elder*, 529 F.3d at 413–14 (internal quotation marks and citations omitted); *see also Burmester*, 920 F.3d at 510.

Badtke asserts that the ALJ failed to properly discuss her school records. The ALJ noted that Badtke achieved some improvement in her functioning with an Individualized Education Program (IEP) as a student. She found that Badtke's performance in school in the years leading up to her disability cessation date is not consistent with her allegations of ongoing disability. The ALJ stated that, while Badtke required an IEP as a student, Badtke achieved some improvement in her functioning with the IEP. The ALJ noted, for example, that at an October 2, 2012, IEP meeting, evaluators noted that, while Badtke continued to struggle with homework completion, she showed tremendous growth in maturity in decision-making. *Id.* (citing Exs. 25E & 1F). She

9

observed that the evaluators further noted that Badtke worked independently, took a leadership role in group situations, and helped other students. *Id.* (citing Exs. 25E & 1F). The ALJ noted that Badtke had the option of graduating earlier, but Badtke elected to complete the full school year. *Id.* (citing Exs. 25E & 1F).

Badtke maintains that the ALJ failed to address other aspects of the IEP that showed Badtke required significant support to achieve these improvements, such as the fact that Badtke does not enjoy group work of any kind. An ALJ is not required to discuss every piece of evidence in the record, however. *See Simila*, 573 F.3d at 516. Even though the ALJ's decision does not reference this aspect of the IEP, Badtke does not show how she was harmed in light of the fact that the ALJ gave little weight to the conclusions reached by the IEP evaluators. R. 53. The ALJ explained that the evaluators offered their assessments prior to Badtke's disability cessation date and did not have the opportunity to consider Badtke's functioning during the relevant period. R. 53–54. She simply observed that the observations in the IEP of Badtke's activities supported that Badtke has more functional ability than alleged. R. 54.

The ALJ also evaluated the objective medical evidence. R. 48–54. After summarizing the medical examiners, the ALJ concluded that the observations and findings noted by examiners are not consistent with Badtke's allegations regarding her functional limitations. She explained:

> She exhibited mood and affect abnormalities on a consistent basis, but she nonetheless interacted cooperatively with examiners and often, but not always, demonstrated appropriate eye contact. The claimant also demonstrated relatively normal attention, concentration and memory and she performed well on intelligence testing. Overall, these observations and findings are inconsistent with the claimant's allegations of severe and debilitating symptoms. The claimant's level of treatment is also not consistent with her allegations. As discussed above, she required only limited and conservative treatment during the relevant period. She saw Dr. Norris for medication management since her disability cessation date, but she otherwise required no significant mental health treatment. At [the] hearing, the claimant testified that she continues to take Fluoxetine daily and Lorazepam a couple of times per month. As discussed above, she noted that her medication was helpful in

10

> alleviating some of her symptoms. This level of treatment, and her response to that treatment, is not consistent with her allegations.

R. 51. The ALJ adequately explained how the examinations and findings were inconsistent with Badtke's allegations of severe and debilitating symptoms.

Badtke argues that the ALJ erred in considering her infrequent and conservative treatment. *See* 20 C.F.R. § 404.1529(c). The ALJ noted that providers did not recommend anything more than medication. The ALJ also acknowledged that Badtke told treatment providers that her medication was helpful in alleviating some of her symptoms but did not eliminate them. After reviewing the evidence in the record, it was not improper for the ALJ to conclude that the level of treatment Badtke received, and her response to that treatment, was not consistent with her allegations. R. 51.

Badtke also asserts that the ALJ inappropriately equated her activities of daily living with an ability to sustain appropriate workplace interactions. "ALJs are tasked with reviewing the evidence provided and assessing whether a claimant is exaggerating the effects of her impairments, and reviewing daily activities is an important part of that evaluation." *Green v. Saul*, 781 F. App'x 522, 526 (7th Cir. 2019). In this case, the ALJ thoroughly summarized Badtke's activities of daily living. R. 51–52. The ALJ evaluated Badtke's activities of daily living against her alleged symptoms and concluded that, "[w]hile the claimant's activities are not outcome determinative, they nonetheless suggest that the claimant retains greater functional abilities than alleged." R. 52. In this case, the ALJ considered Badtke's activities of daily living and the other evidence in the record and tailored an RFC that fit her limitations. That was not "patently wrong." *Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013).

The ALJ explained that the medical and nonmedical evidence, Badtke's activities of daily living, and her testimony contradicted her statements about the intensity, persistence, and limiting

11

effects of her symptoms. The ALJ's assessment of Badtke's statements is not "patently wrong." *Id.* Distinguishing between what a person cannot do and what a person will not do is often difficult, even for the person herself. The question for this Court to decide is whether the ALJ provided a logical bridge from the evidence in the record to her conclusions. Here, I conclude that the ALJ did. Therefore, remand is not warranted on this basis.

**C. RFC Assessment**

Badtke challenges the ALJ's RFC assessment. An RFC is an assessment describing the extent to which an individual's impairments may cause physical or mental limitations or restrictions that could affect her ability to work. SSR 96-8p, 1996 WL 374184, at *2. The RFC represents "the maximum a person can do—despite his limitations—on a 'regular and continuing basis,' which means roughly eight hours a day for five days a week." *Pepper*, 712 F.3d at 362 (quoting SSR 96-8p). The responsibility for assessing a claimant's RFC in a case that proceeds to a hearing lies with the ALJ. 20 C.F.R. § 404.1546(c). In forming the RFC, an ALJ must review all of the relevant evidence in the record and "consider all limitations that arise from medically determinable impairments." *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014).

Badtke asserts that, despite giving his opinion great weight, the ALJ failed to incorporate all of the limitations Dr. Peter Kores found into the RFC. In February 2014, consulting psychologist Peter Kores, Ed.D., conducted a mental status evaluation (MSE). R. 611–18. Dr. Kores found that Badtke's "[i]nitial affect was appropriate and Micheal made good eye contact and was noted to be a prompt [sic] and thought to be forthright reporter." R. 611. She described her medical history and daily activities which, at the time, included chores such as cooking, cleaning, and laundry. R. 612. Badtke tested well above average (93rd percentile) in verbal comprehension and slightly above average (55th percentile) in full scale IQ on the Wechsler Adult Intelligence Scale test. She tested at the 30th percentile in perceptual reasoning and working

12

memory, and in the 34th percentile in processing speed. R. 615. In an academic test, she tested well in reading and poorly in math, with Dr. Kores noting that she had "only basic functional ability in this area." R. 617. Overall, Dr. Kores determined that Badtke functioned "within an average intellectual classification." *Id.* He opined that, based on her MSE and psychometric appraisal, she had a "mild limitation in understanding and remembering simple instructions," but her history indicated she would have moderate limitations in carrying out instructions, and she would have a "moderate limitation responding appropriately to supervisors and coworkers." R. 618. Finally, he assessed "mild limitation with concentration, attention and work pace," with her pace possibly affected by her weight, and "moderate limitation adapting to change." *Id.* The ALJ assigned this opinion great weight. R. 52. She found that Dr. Kores' opinions were consistent with his observations during the examination and were also consistent with Badtke's treatment during the relevant period. R. 53.

Badtke argues that, although the ALJ afforded great weight to Dr. Kores' opinion, she failed to incorporate all of the limitations he found into her RFC. In particular, Badtke asserts that Dr. Kores opined that she had moderate limitations in responding appropriately to supervisors and coworkers but the ALJ provided only a qualitative limitation in this area, limiting her to "occasional interaction with coworkers and supervisors." R. 48. She also asserts that the ALJ was left with an "evidentiary deficit" because no medical source authored an opinion consistent with the limitations the ALJ found. Pl.'s Br. at 16, Dkt. No. 21 (citing *Suide v. Astrue*, 371 F. App'x 684, 689–90 (7th Cir. 2010)).

But an ALJ's RFC assessment is not required to mirror any medical source's assessment. *See Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) ("[A]n ALJ must consider the entire record, [and] the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians." (citation omitted)); *Fanta v. Saul*, 848

13

F. App'x 655, 658 (7th Cir. 2021) ("An ALJ has 'final responsibility' for determining a claimant's residual functional capacity and need not adopt one doctor's opinion." (citing 20 C.F.R. § 404.1527(d)(2)). The ALJ gave Dr. Kores' opinion great weight; she did not adopt it wholesale. Badtke maintains that Dr. Kores' findings were consistent with the findings of the state agency reviewing psychologists, who opined that Badtke was moderately limited in accepting instructions and responding appropriately to criticism from supervisors, as well as the findings of Drs. Kaplan and Norris, who found that Badtke was markedly limited in this area. But no medical source indicated that she had any specific qualitative limitations on her ability to interact with or respond appropriately to supervisors. Although Badtke asserts that a limitation to "occasional" interaction with coworkers and supervisors does not address a "moderate" limitation in her ability to respond appropriately to coworkers and supervisors, she does not explain how the RFC could be corrected to address the limitation.

The ALJ formulated the RFC based upon all of the medical opinions and other evidence in the record. Badtke asserts that the evidence in the record showed greater social limitations. She cites to her school IEP, which stated that she required additional coping skills in stressful situations as she could become easily frustrated; her statements to Dr. Kores that she had a temper, got angry over "random things," and wanted to kick people in the shins; and her function reports, in which she stated that she often argued with authority figures who gave instructions. Pl.'s Br. at 11–12. The ALJ acknowledged that Badtke had impulse control problems but concluded that Badtke's apathetic mood and impulse control problems did not support social limitations beyond those included in the RFC. R. 49. The ALJ's determination that Badtke is limited to occasional interactions with supervisors and coworkers is consistent with Dr. Kores' opinion and supported by the record as a whole.

Badtke asserts that the ALJ erred in relying on certain aspects of the doctor's reports and ignoring contradictory evidence in the same report.  But in making the RFC assessment, the ALJ considered the totality of the evidence, including the medical record, Badtke's progress in school, her activities, and her testimony.  Badtke's criticisms essentially request that the Court reweigh the evidence and interpret it differently.  But that is not the Court's role.  I find no error in the ALJ's consideration of the evidence in formulating the RFC.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.  The Clerk is directed to enter judgment in favor of the Commissioner.

**SO ORDERED** at Green Bay, Wisconsin this 24th day of March, 2022.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

15

Case 2:19-cv-01723-WCG   Filed 03/24/22   Page 15 of 15   Document 30